Mr. Weiberg, good afternoon. Good afternoon, Your Honor. May it please the Court. As Your Honors are aware, we have argued a great number of errors in our briefs, and we'll get to as many of those as possible. I would like to initially begin by briefly addressing the 120-day speedy trial violation in regards to the late added charge of armed individual criminal in this case. And on that point, I would simply note first that the state has not disputed the merits of this claim at all. They apparently acknowledge that, in fact, Mr. Hopkins' speedy trial right was violated. They have simply argued that this issue should be considered forfeited, because although Mr. Hopkins raised a 120-day speedy trial, late added charge, mandatory joinder argument below, it was not the exact same identical 120-day speedy trial, mandatory joinder, late added charge argument that he has raised on appeal. And Your Honors, first of all, under Illinois Supreme Court precedent, he's not required to make an exact same argument. Under People v. Hyder, People v. Moore, he's simply required not to be raising a completely different argument. So that's step one. Step two, of course, is the fact that the only difference between these arguments is that for appeal, Mr. Hopkins has accepted the state's proffered custody date of December 2nd as the beginning of the speedy trial clock. In the trial court, Mr. Hopkins argued it should have begun sooner. But far from not having been presented with this date, this custody date, the circuit court actually ruled that this was the custody date. So all that Mr. Hopkins has done is accepted the state's contention and the court's rule. So we would maintain that there is simply no forfeiture here. And we would argue as a sort of reserve that even if this court were to find some form of forfeiture where Mr. Hopkins was tried and convicted of a charge which he never should have been charged with, that certainly falls a second-pronged claim and error and calls the fairness of that trial into question. And, Your Honors, that initial speedy trial mistake leads into the beginning of so many of the errors in this case. And it begins with the submission of two instances of prior convictions being entered into evidence at Mr. Hopkins' trial as substantive evidence, not impeachment, he never testified, but as substantive evidence against him that were only relevant to this charge of unhabitual criminal, which never should have been in front of the jury in the first place. And, Your Honors, that's bad enough. But once the court had made its ruling and counsel is faced with that ruling, it's defense counsel's job to step up and try to protect his client, reduce the prejudice, keep as much of the bad information out as you can. And it just so happens that P. Walker provides us exactly the mechanism by which you do that. You stipulate to the fact of a qualifying prior conviction and leave out the name and nature of that conviction so as not to expose the jury to any more prejudicial information. Counsel failed to do that, and instead the jury was, in fact, called the name and nature of both of these convictions, neither of which were, in fact, admissible for any rational purpose. And as we go on from there, this pattern of failing to protect the defendant's rights at trial continues and continues at great length. We have a number of instances of inadmissible testimony. We have, I believe it was roughly 10 transcript pages of testimony from the complainant, Chayvon Collins, about everything ranging from the neighborhood he grew up in, what his childhood was like, what the crime was like in his area, and then towards the end of his testimony, talking about his children, his girlfriend's children, the fact that he loved these children, he thought they were good children, he pays child support. And not a word of any of this was actually admissible evidence. None of it is relevant to any issue in this case. It was simply there to invoke the jury's sympathy for Mr. Collins, which is not a relevant purpose for evidence. However, again, over 10 transcript pages of this inadmissible testimony, counsel did not object a single time. This continues. We have witnesses who are delivering lay opinion testimony on things that are plainly a matter of medical expertise. We have a witness speculating about why a driver of a different vehicle that he has nothing to do with may have been doing what he was doing. But where we really hit some of the worst of this is when we get to the stories to tell. And the first one is one that the jury already heard, the story about Mr. Hopkins and Chabon and Tyree Collins and Ms. Kendrick, and they're in a car and there's an altercation, and Mr. Hopkins ends up getting left on the side of the road. But that's the initial matter, and the jury has already heard that from Mr. Collins, but they hear Ms. Kendrick's version. But then we get this new story, and it's a story that's, frankly, a little frightening. It's this story of two people in a car at night being overtaken by another car at about 3 a.m. They are, in essence, blocked off the road. Someone jumps out, fires multiple shots into the car, shoots Ms. Kendrick, is shooting at this fellow, Tyree Collins, who's running off into the field. And multiple times in the course of telling this somewhat heroine story, Ms. Kendrick testifies the person who did that was Clarence Hopkins, the defendant. Clarence Hopkins did this. However, what we discover relatively shortly upon cross-examination is that Ms. Kendrick actually has no idea if Clarence Hopkins did this. Ms. Kendrick did not see, could not identify Mr. Hopkins. According to Ms. Kendrick's own testimony, the reason that she says Clarence Hopkins did this is because the police came and told her that afterwards. Her words were, the police identified him for me. To be honest, one of the most fundamental rules of evidence in Illinois and every other state is that a witness has to have personal first-hand knowledge of what they're testifying to. Ms. Kendrick admitted on the stand that she did not have personal first-hand knowledge that Clarence Hopkins had done any of these things. And yet she was allowed to testify to it at length, and upon eliciting this rather startling testimony, counsel did nothing. Counsel did not move to strike. Counsel did not move for a mistrial. Counsel did not ask for a sidebar and say, judge, geez, we just got this whole story of people getting shot at in a car, and it turns out she doesn't know if it was the defendant. Counsel did not accuse of attempt murder. A story about him supposedly trying to kill two other people is plainly, profoundly prejudicial. But counsel failed to take action. And this completely inadmissible evidence was allowed to stand. The jury was allowed to consider it. And to be honest, as we keep going and we see further and further along in this trial, we get to directed verdict. Mr. Hopkins is facing a charge right now that's going before the jury, which he literally cannot legally be convicted of. He's been charged with armed violence, and there is no predicate which, under the plain terms of the armed violence statute, can actually suffice to support an armed violence conviction. There is no predicate offense charge, there is none alleged, and there is no evidence of that. All of the predicates, all of the charges involved, are all specifically disallowed by the armed violence statute. They cannot qualify. And yet at directed verdict, counsel makes no mention. Counsel allows this charge to go to the jury for their consideration, and Mr. Hopkins was actually found guilty of this charge when it's legally impossible for him to be found guilty of this charge. We get to jury instructions. Mr. Hopkins is facing an enhancement in this case. He was charged with enhanced attempt murder, which carries an additional 25 years to life in prison. Regardless, he could get the minimum on attempt murder. If he is found guilty of the enhanced version, he's seen 25 to as much as life in prison. And as this court has held previously in People v. Fonder, that is an essential element of the offense. Because it's adding this massive additional sentence, this is an essential element of the offense, and it's one that the jury is required to be instructed on. They were not. They were instructed on simple attempt murder. None of the enhancing facts were included at all. Counsel does not object, does not propose a different jury instruction, does not hold the state to their burden to prove these additional factors that are going to add 25 years to life to Mr. Hopkins' sentence if they're found. Instead, counsel is standing there arguing for jury instructions that have no relevance. Counsel is saying we should have instructions on prior inconsistent statements when there were no prior inconsistent statements. Counsel doesn't even allege that there were prior inconsistent statements. When the judge asks him, he says, Your Honor, I can't remember all the evidence. But it might have happened, so we should let the jury consider it. Your Honors, to call this effective assistance of counsel would be to deprive the term of any meaning. It is simply a virtual capitulation. And the divorce comes when the trial is over. Mr. Hopkins has, perhaps after all this, not surprisingly, been found guilty. And counsel proceeds immediately to sentencing and files no post-trial motion, despite the fact that counsel himself filed pre-trial motions, including the speedy trial motion, which clearly need to be preserved, where plain allegations of trial error, there is no post-trial motion. Instead, counsel proceeds to sentencing and simply argues that the court should lower Mr. Hopkins' sentence because, in his words, it's not like he shot you or me, the man he shot was a drug dealer. Your Honors, this many errors, this many problems, this many impacts on virtually every element of this case simply cannot give rise to a verdict that is worthy of this court's confidence. And furthermore, we would note that even leaving the enormous prejudice of all these different mistakes aside, as this court held in Fonder, the jury instruction error alone is second-pronged plain error. The failure to apprise the jury of the essential elements of the offense. Isn't that kind of an Apprendi issue? You know, it's enhancing the facts so you got them. It is certainly related to Apprendi, yes. When this court decided Fonder, it was referring to Apprendi, although it was also referencing a lot of the jury instruction cases and things like that as well, yes. And even the Supreme Court has said not all Apprendi issues are reversible, not all Apprendi errors are, you know, it's a question of. Well, Your Honor, that is currently, yes, that Apprendi errors are generally susceptible to harmless error analysis. However, this court has at least established in regards to these kinds of instructional errors when viewed as a jury instruction problem. And I'd note that what this court did in Fonder was not what you might do in a sentencing issue where you would remand for a different sentencing or where you would remove an enhancement that was imposed. This court wasn't viewing it through that lens. What this court said was what we're talking about here is whether or not the jury was instructed on what are the essential elements of the offense. And if the jury wasn't instructed on the essential elements of the offense, then they can't possibly reach a proper verdict on that. Well, but the Supreme Court has disagreed with this court on an issue, hasn't it? Well, not since Fonder was released. What I would suggest is that Fonder is drawing a distinction between different types of arguments here. You have a sentencing-related argument via Apprendi, which refers to, you know, the question of whether you should or should not have been subjected to this enhancing factor. However, what this court determined in Fonder was that actually the appropriate relief in a circumstance like this is to grant a new trial with a properly instructed jury. Because the problem here isn't whether you got the right or wrong sentence. The problem here is that the jury was not instructed on the proper elements of this offense. And therefore, they could not have reached a proper verdict on the offense itself. Now, there may well be circumstances where an Apprendi-type error would arise that would not implicate the essential elements of the offense in the manner that this does. But certainly, again, by analogy to Fonder and by analogy to some of the other jury instruction cases, we do have a situation here where the offense, as charged in the information in this case, the jury was not instructed on the elements of that offense. And that, under a fair bit of precedent, as cited in Fonder and other cases, is second-pronged plain error and calls for reversal regardless of what we have argued is essentially a virtual cavalcade of error that took place throughout this entire trial. And so, Your Honors, for the reasons I've stated here and for the reasons stated in our briefs, we would ask you to reverse Mr. Hopkins' convictions and remain for a new trial on the proper charges with a properly instructed jury. And I'll reserve any other remarks for rebuttal. Mr. Arado, good afternoon. Good afternoon, Your Honor. May I please report? Good afternoon, Your Honor. Perhaps I'm making an understatement in saying that this was not a perfect trial. Regarding the first couple of arguments, in order to preserve a speedy trial claim, you of course have to file the claim before trial. Now, when we're talking about forfeiture, the idea behind forfeiture is that you present to the, you're supposed to present to the trial judge the argument that you want the trial judge to hear so that he can rule upon that argument so it doesn't have to go up to you publicly. The point behind our argument is that all he said below was July 29th, July 29th, July 29th, July 29th, it's from that date. So he never presented to the court, hey, you weren't trial within 120 days of December 2nd. So if he had brought that to the judge's attention, perhaps it would have been a different result of the motion. So as far as forfeiture concerns, we believe that it was forfeiture. If this court reviews it under a plain error or decides that it was forfeiture, the appropriate remedy is to vacate the armed habitual criminal conviction and to reinstate the unlawful use of a weapon conviction. So there's really, that's the result that should occur if that's the case. Regarding the other alleged errors, we do not concede that all of them are errors, in particular the lay opinion's testimony regarding the victim potentially dying. Well, it doesn't take an expert to say that somebody who's been shot more than seven times and is bleeding out is probably going to die, or at least you believe it's going to die. I don't think you need an expert for that. I think the lay person is more than capable of testifying for that. And the victim himself can testify, yeah, I probably will have some problems in the future considering one leg is shorter than the other, I can't feel part of my fingers, all these other things that are going to affect his health. Also the party stipulated that he was going to have long-term health problems, so I don't see there's any problem with those particular issues. The prior two convictions, perhaps he didn't need both of those convictions, but he was charged with unlawful use of a weapon by a felon, so it had to be proven that he was a felon. So at least something was going to have to be presented. And at least an effort was made to limit the damage by not including what the sentences were for those offenses. Anyway, the bottom line is, what is the core evidence of this case? Siobhan Collins testified that late at night, he was walking, the defendant came out, said some words to him that suggested he was about to attack him, pulled out a gun, shot him multiple times, and during the course of it, dropped his cell phone, oh, also had his fingerprints on it, the defendant did. The girlfriend of the defendant testified that she picked up the defendant nearby where the shooting occurred, shortly after the shooting occurred, and the girlfriend testified that the defendant normally had two cell phones, but he was missing one cell phone, and also the defendant admitted that he allegedly shot the victim. So the core evidence in this case fully supports the convictions in this manner. What about Kendrick's testimony? It is uncertain why they would have gone there, really, particularly if she couldn't say for certain who the actual shooter was. However, the prosecutor brought to the attention of the court that the defendant had been convicted of aggravated battery of Kendrick. So there was at least support, even if the jury didn't necessarily hear that, there was support for her testimony saying it was the defendant that did the shooting. So if he was wrongfully convicted of the charge, then that makes it okay? Wrongfully convicted of which charge, I'm sorry? You said that he was convicted of battery on that charge, but she couldn't identify it. We don't know what the other evidence was in that case, because there was two people who were being shot at in that case. One person jumped out of the vehicle and was running the other way, she was in the vehicle and was also being shot, so it could very well be that the other person identified the defendant as the shooter. So without those details, all we know is he was convicted of it. But that was in another case, right? Correct. But in this case, allowing her to testify that he did it, he did it, he did it, I didn't see him, but the police told me it was him. Sure. So in this case, and no motion to strike the testimony, so what do we make of that? You make of that that it was probably not something that the jury should have heard, but it's something that would not have resulted in the defendant's conviction being anything other than what happened. I mean, you know, should they, if you peel away all the squishy parts of this case, all the errors, alleged errors anyway, of counsel, the alleged errors of the trial judge, you know, you come to the same result of, it's almost uncontroverted that he shot Siobhan Collins multiple times, and he had serious bodily injury, and that anybody would have known that that bodily injury would have taken place. And that's basically the only thing that I can respond to that is the core of what happened. Is that a large part of our purpose? So you're basically saying error, but harmless, there's no knowing prejudice because of the victim's testimony. Correct. I mean, it's non-prejudicial because it's plain error and a claim of ineffective assistance of counsel, so the defendant's burden has to show that it was prejudicial. Well, I was just going to say that a large part of what we're called upon to do here in the review process is to determine whether there was procedural error and whether the procedural error is such that one cannot have confidence in the verdict. And it sounds like you're conceding that there was a fair amount of error in this trial. It was, as I say, not a perfect trial in any way. It wasn't even close. You're a master of understatement. The point is, if you send it back down, if you tried this case with the core evidence 100 times, you're going to get the same 100 results of the conviction. But the difference might be that in one case he's convicted in a fair trial rather than an unfair one. Well, it's a matter of prejudice and whether or not it ultimately came to that result. In other words, we're not conceding it was a completely unfair trial, if I may. That's fine. I wouldn't expect you to do that. No. Any other matters we would ask that this court affirm. Thank you, Your Honor. Thank you. Mr. Weiberg. Your Honor, I'll do my best to be brief. Just as an initial matter, it is not uncontroverted what happened here. There was a trial. There was a plea of not guilty. At that point, it becomes the state's burden to prove otherwise. Well, let's be real brief. Let's just talk to Mr. Durato about it. And that was, you got a victim that says, the defendant shot me. Yes. And I'm really hurt. And I'm hurt bad. And so you take out all this error. And is the result going to be any different? Well, Your Honor, I actually have two responses to that. I would say, first of all, you have a victim who says Mr. Hopkins shot me. You have a victim who has a long history of problems with Mr. Hopkins, clearly does not like Mr. Hopkins very well, and who viewed somebody late at night and may not have gotten the best look at them and may have reached certain assumptions about what did or did not happen. That's going to be a question for the jury. In fact, one of the problems with what counsel did or more aptly failed to do here is that that very victim, Shavon Collins, spent probably close to five minutes of speaking time telling the jury all sorts of sympathetic facts about himself to make himself more credible, to make it that much more difficult to cut down that very testimony that you've correctly identified. It's certainly important testimony. Well, what evidence did they have to suggest that he didn't have the opportunity to look at notes? He knew the defendant. He was almost face-to-face with him. Some words were exchanged. Well, yes, he knew Mr. Hopkins, and again, it was late at night, it was dark, so he did not have the best opportunity to view. He also did acknowledge that, in point of fact, being a drug dealer, he may have been other people out there who didn't like him very much and might have wanted to shoot him. So there is certainly evidence in the record that just given the time, the lighting conditions, et cetera, this might not have been the world's most reliable identification, again, given that he had some reason to feel animosity towards Mr. Hopkins anyway. But, Your Honors, even beyond that, if we were talking about one error here, we were talking about two errors here, we were talking about something fairly minor or a few hearsay statements got in that really shouldn't have gotten in, then we might be balancing a little bit more. Maybe we look at this and say, well, there was a victim ID, so maybe it's not prejudicial. We are talking about error at virtually every stage of this trial with such a wide array of evidence. And particularly, I would note that we are talking about an attempt crime here, which involves a mental state, and among other things, a mental state is profoundly influenced, you know, a jury's conclusion about a mental state is profoundly influenced by things like a jury's belief that this man has engaged in an attempted murder of other people previously, when it turns out, in point of fact, the evidence showing that wasn't even remotely admissible. And I would note... How many times was the victim shot? I believe he was struck a grand... I want to say eight times he was struck, but I'm not 100% certain. But I believe... That's pretty strong evidence that an attempted killer can do very badly. Well, yes, it is. It's strong evidence. But, again, the question is not whether the state had a case, not even whether the state had a good case, but whether there is, in the words I believe the Seventh Circuit used, a more than negligible chance that all of this error impacted the outcome of this trial. And then I would also point out, as Justice McDade was saying, one of the real keys that we're dealing here, and the big question is, was this a fair trial? Because cumulative error can result in reversal, where it simply becomes a point where we have to look at this and say, is this a trial that this court can have confidence in? Is this a trial that anyone can have confidence in? And is this a trial that can put a man in prison for 85 years? And under our current system of justice, we believe that certain basic guarantees apply, and you have to get certain things, and one of those is effective assistance of counsel. And no one could say that what happened in that courtroom was effective assistance of counsel. Counsel, one minute. And so, Your Honors, if there are no further questions, I would just, based on these arguments and the arguments in our briefs, ask this court to remain in this case for a fair trial on, you know, at least those charges of which he could be properly convicted. Thank you. Thank you. We thank both of you for your arguments this afternoon. We'll take the matter under advisement and we'll issue a written decision as quickly as possible. The court will now stand in recess until 9 o'clock tomorrow morning.